■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v THOMAS PERRY, Appellant.—Appeals by the defendant from *two judgments* of the Supreme Court, Queens County (Rotker, J.), both rendered January 2, 1986, convicting him of two counts of attempted burglary in the second degree (one count as to each indictment), upon his pleas of guilty, and imposing

sentences. The appeals bring up for review the denial (Giaccio, J.), after a hearing, of those branches of the defendant's motion which were to suppress physical evidence as well as oral statements made by him to law enforcement authorities.

Ordered that the judgments are affirmed.

At 10:45 P.M. on May 3, 1985, two police officers on routine motor patrol received a radio transmission reporting a suspicious male, on a ladder in the rear of 110-45 71st Road. While responding to that call, the officers observed the defendant walking down a dark alley toward the rear of a building that was about 100 feet from 110-45 71st Road. The officers saw no one else in the vicinity. One of the officers went down the alley after the defendant and when he got to the rear of the building, saw the defendant attempting to pull himself up onto a fire escape. The officer, who had drawn his gun, ordered the defendant to "freeze" and asked him what he was doing. The defendant replied, "Nothing". The police officer observed a bulge in a pouch of defendant's sweatshirt by his waistband, and upon patting down the defendant, felt something "like a hard ball" in the pouch, which he removed. It was approximately 20 pieces of jewelry wrapped in a handkerchief.

The defendant was placed under arrest, handcuffed and advised of his rights. The officer asked defendant what he was doing and the defendant answered that "he hit a place on the next block". The defendant then took the officers to the rear of 110-45 71st Road where he pointed out an apartment on the sixth floor. One of the officers climbed the fire escape in the rear of 110-45 71st Road and discovered a window on the sixth floor broken and the window gate pushed aside. While being processed in the police station about an hour later, the defendant spontaneously stated that he did not want to commit burglaries, but needed the money to pay for his girlfriend's cocaine habit. The next morning at 7:45 A.M., the defendant was questioned by a detective, who again advised him of his rights, and the defendant repeated his confession concerning the burglary.

The pivotal questions on this appeal concern the lawfulness of the police officer's actions when he came upon the defendant at the fire escape, and whether or not the arrest of the defendant was based upon probable cause. The hearing court answered these questions in the affirmative and we agree.

Clearly, the police officers had the duty to investigate the occurrence reported over the police radio. The defendant was observed in the vicinity of the premises described over the

radio. These events constituted an articulable reason for the officer to exercise his common-law right to detain the defendant and inquire as to his activities *(People v DeBour,* 40 NY2d 210). This the officer did and the defendant did not offer an explanation *(cf., People v Bronston,* 68 NY2d 880). Added to this was the officer's observation of the defendant attempting to pull himself up to the fire escape ladder, which was further indication that criminal activity was afoot. The fact that the officer had his gun drawn did not convert this lawful, limited detention into an arrest. Rather, the officer engaged in a reasonable, self-protective means under the circumstances of the confrontation which occurred at 10:45 P.M. in the rear of a dark, deserted alley *(see, People v Chestnut,* 51 NY2d 14, *cert denied* 449 US 1018; *People v Finlayson,* 76 AD2d 670, *lv denied* 51 NY2d 1011, *cert denied* 450 US 931; *People v Crutchfield,* 111 AD2d 346, *lv denied* 66 NY2d 762).

Under all the circumstances presented to the officer, he had reasonable suspicion that criminal activity was afoot. Unlike *People v Wiley* (110 AD2d 590), the officer in this case was able to articulate facts justifying his suspicion. His further observation of a bulge in the pouch of the defendant's sweatshirt, at the waistband, justified the limited search of the defendant pursuant to CPL 140.50 (3). Upon feeling a "hard ball" in the pouch pocket, the officer properly removed it to determine if it was a weapon *(People v Larkins,* 116 AD2d 194, *lv denied* 67 NY2d 1054; *People v Bowens,* 129 AD2d 297). That action was clearly warranted under CPL 140.50 (3). When the officer saw approximately 20 pieces of jewelry in the handkerchief, his reasonable suspicions escalated to probable cause. Therefore, the arrest of the defendant was lawful.

The defendant does not question the voluntariness of his statements made to the police officers and the detectives, but argues that they were the product of an unlawful arrest. Since we have found that the arrest was lawful, the suppression of the statements voluntarily made by the defendant after being advised of his rights, was properly denied. Lawrence, J. P., Eiber and Sullivan, JJ., concur.

Harwood, J., dissents and votes to reverse the judgments appealed from, on the law and the facts, to grant those branches of the defendant's omnibus motion which were to *suppress* physical evidence and oral statements to the police, and to dismiss the indictments, with the following memorandum: I must dissent. The arresting officer conceded at the suppression hearing that until he reached into the defendant's

sweatshirt pouch and seized what proved to be approximately 20 pieces of jewelry wrapped in a handkerchief he had no information that any crime had been committed. Because the legality of the arrest depends upon the validity of the underlying search and seizure, there is only one pivotal question raised by this appeal: whether the arresting officer was justified in seizing the evidence. In my opinion he was not justified.

Apart from the officer's concession that probable cause did not exist prior to the time he confiscated the jewelry, the evidence adduced at the suppression hearing demonstrates that, until the moment of confiscation, the officer possessed, at most, only a "reasonable suspicion" that the defendant was about to commit a crime. Assuming its existence, reasonable suspicion gave rise to a justification to "stop" the defendant and to demand his name, address and an explanation of his conduct (CPL 140.50 [1]). The hour and location of the "stop" in this case may even have justified conducting the authorized limited inquiry after giving an order to "freeze", with his gun drawn (see, People v Chestnut, 51 NY2d 14, cert denied 449 US 1018). However, after receiving that order, and complying, the defendant made no furtive or threatening gestures so as to justify any greater level of intrusion by the police officer. Moreover, the defendant's negative response to the officer's inquiry does not constitute a sufficient predicate for the search and seizure (cf., People v Howard, 50 NY2d 583, cert denied 449 US 1023). The only possible justification for the "pat down", the subsequent search of the defendant's sweatshirt pouch, and the seizure of its contents, would be a reasonable belief on the part of the officer that he was in danger because defendant was armed (Terry v Ohio, 392 US 1; CPL 140.50 [3]). There is no evidence that a justification existed here (cf., People v McNatt, 65 NY2d 1046; People v Vullis, 131 AD2d 616; People v Robinson, 123 AD2d 796; People v Kugler, 122 AD2d 955).

"In the case of [a] self-protective search for weapons, [the police officer] must be able to point to particular facts from which he reasonably inferred that the individual was armed and dangerous" (Sibron v New York, 392 US 40, 64). Moreover, once the reasonable basis for the officer's fear abates, so does the basis for further intrusive conduct (People v Roth, 66 NY2d 688). In this case, the radio transmission to which police were responding contained no mention of a weapon (cf., People v Larkins, 116 AD2d 194, lv denied 67 NY2d 1054) and the only mention of a weapon during the course of the suppression hearing was when, on cross-examination, the officer was

asked if he had any indication that the defendant had one. The officer responded "[j]ust the observance of the bulge".

The "bulge" the arresting officer observed apparently bore no outward appearance of a weapon (cf., People v Prochilo, 41 NY2d 759; People v Wiley, 110 AD2d 590). But assuming "just [its] observance" constituted a "particular fact" from which the officer reasonably inferred that the defendant was armed so as to justify a "pat down", there is no evidence to support a claim that the results of the "pat down" justified an increase in the level of intrusion to invasion of the defendant's clothing and taking what to the touch was not a weapon but "a bulge" or a "hard ball" (cf., People v Rivera, 14 NY2d 441, 447, cert denied 379 US 978). The officer himself did not claim he believed the "hard ball" to be a weapon and he did not advance the notion that by invading the defendant's clothing he acted to protect his safety (see, Sibron v New York, 392 US 40, 64-65, n 21, supra; People v McNatt, supra). His "search" therefore, should have ended prior to that invasion (see, People v Roth, supra).

The hearing court should have suppressed the tangible evidence as the product of an unlawful search. The defendant's statements to the police, the product of and tainted by the arrest premised on the unlawful search, should also have been suppressed (see, Dunaway v New York, 442 US 200; People v Milaski, 62 NY2d 147). I would reverse the judgments appealed from, and, since there is no indication that any untainted evidence exists, dismiss the indictments.